**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **TRACY M. THOMPSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. CIV-15-288-CG** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of the** | ) | |
| **Social Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Plaintiff Tracy M. Thompson brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of the Social Security Administration ("SSA") denying Plaintiff's application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. The Commissioner has answered and filed the administrative record (Doc. No. 11, hereinafter "R. _").[1] The parties have consented to the jurisdiction of a United States Magistrate Judge. Doc. No. 13. Having reviewed the record, including the transcript of the administrative hearing and the decision of the administrative law judge ("ALJ"), as well as the pleadings and briefs of the parties, the Court REVERSES the Commissioner's decision and REMANDS the case for further proceedings under the fourth sentence of 42 U.S.C. § 405(g).

---

[1] With the exception of the administrative record, references to the parties' filings use the page numbers assigned by the Court's electronic filing system.

## PROCEDURAL HISTORY

Plaintiff protectively filed her application for SSI on November 15, 2011, alleging disability based upon bronchitis, chronic obstructive pulmonary disease, bipolar disorder, emphysema, seizures, and depression. R. 169-80. Following denial of Plaintiff's application initially and on reconsideration, a hearing was held before an ALJ. R. 31-86, 93-96, 100-02. The ALJ issued an unfavorable decision on November 27, 2013. R. 11-24. The SSA Appeals Council denied Plaintiff's request for review, making the ALJ's unfavorable decision the final decision of the Commissioner. R. 1-4; *see also* 20 C.F.R. § 416.1481. This action for judicial review followed.

## ADMINISTRATIVE DECISION

The Commissioner uses a five-step sequential evaluation process to determine eligibility for disability benefits. *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009); 20 C.F.R. § 416.920(a)(4). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since November 15, 2011, the application date. R. 13; *see* 20 C.F.R. § 416.971. At step two, the ALJ determined that Plaintiff had the severe impairments of "asthma, chronic obstructive pulmonary disease (COPD), affective disorders, and past alcohol abuse." R. 13; *see* 20 C.F.R. § 416.920(c). At step three, the ALJ determined that Plaintiff's impairments did not meet or equal any of the presumptively disabling impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, including "affective disorders" (listing 12.04) and "substance addiction disorder alcohol" (listing 12.09). R. 13-14; *see* 20 C.F.R. § 416.920(d).

The ALJ next assessed Plaintiff's residual functional capacity ("RFC") based on all of her impairments. R. 15-22; *see* 20 C.F.R. § 416.920(a)(4)(iv). The ALJ found that Plaintiff had the RFC to perform medium work, subject to the additional limitations that:

> she must avoid hazards, heights, and machinery[;] could perform simple (SVP 2) unskilled tasks with routine supervision[; and] could have superficial interaction with coworkers, supervisors, and the public on a work basis.

R. 15; *see* 20 C.F.R. § 416.967(c) (defining "medium work"). At step four, the ALJ found that Plaintiff was unable to perform any past relevant work and that transferability of job skills was not a material issue. R. 22-23; *see* 20 C.F.R. §§ 416.965, .968.

At step five, the ALJ considered whether there were jobs existing in significant numbers in the national economy that Plaintiff—in view of her age, education, work experience, and RFC—could perform during the relevant time. Relying on the hearing testimony of a vocational expert regarding the degree of erosion to the unskilled medium occupational base caused by Plaintiff's additional limitations, the ALJ concluded that Plaintiff could perform occupations such as counter supply worker, floor cleaner, and hand packager, all of which offer jobs that exist in significant numbers in the national economy. R. 23; *see* 20 C.F.R. § 416.945(a)(5)(ii). On this basis, the ALJ concluded that Plaintiff had not been under a disability, as defined in the Social Security Act, at any time after November 15, 2011. R. 24; *see* 20 C.F.R. § 416.920(g).

## STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is limited to determining whether factual findings are supported by substantial evidence in the record as a whole

and whether correct legal standards were applied. *Poppa v. Astrue*, 569 F.3d 1167, 1169 (10th Cir. 2009). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003) (internal quotation marks omitted). "A decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Branum v. Barnhart*, 385 F.3d 1268, 1270 (10th Cir. 2004) (internal quotation marks omitted). The court "meticulously examine[s] the record as a whole," including any evidence that may undercut or detract from the ALJ's findings, to determine if the substantiality test has been met. *Wall*, 561 F.3d at 1052 (internal quotation marks omitted). While the court considers whether the Commissioner followed applicable rules of law in weighing particular types of evidence in disability cases, the court does not reweigh the evidence or substitute its own judgment for that of the Commissioner. *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008).

## ANALYSIS

Plaintiff sets forth three allegations of error: (1) the ALJ failed to "weigh and explain" conflicting medical evidence in finding that psychotropic medications "controlled" Plaintiff's mental health symptoms; (2) substantial evidence does not support the ALJ's RFC determination with respect to Plaintiff's mental impairments and limitations; and (3) the ALJ failed to perform a proper credibility determination. *See* Pl.'s Br. (Doc. No. 15) at 6, 15-18, 18-20, 20-23. The undersigned finds that Plaintiff's first and second arguments are meritorious. Because that deficiency requires remand, the

undersigned need not address the remaining claim of error raised by Plaintiff. *See Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003).

*The ALJ's Relevant Findings*

The ALJ found that Plaintiff retained the RFC to perform "simple (SVP 2) unskilled tasks"[2] with "routine supervision" and only "superficial interaction with coworkers, supervisors, and the public on a work basis." *See* R. 15, 22, 24. Unskilled work is defined by regulation as work that "needs little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. § 416.968(a). An RFC for "unskilled work" necessarily contemplates that the claimant retains the "abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting." SSR 85-15, 1985 WL 56857, at *4 (July 1, 1985).

The ALJ did not expressly find that Plaintiff could sustain these activities in an ordinary work setting on a regular and continuing basis. *See* R. 20-22. Several times in his decision, however, the ALJ implied that Plaintiff could have maintained employment after the application date of November 15, 2011, notwithstanding these requirements,

---

[2] "SVP," which stands for "Specific Vocational Preparation," identifies "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." Dep't of Labor, Office of Admin. Law Judges, *Dictionary of Occupational Titles* app. C § II, 1991 WL 688702 (4th rev. ed. 1991). An occupation designated "SVP 2" indicates that it would take the average worker "up to and including 1 month" to adequately perform in any given "job-worker situation." *See id.*

because Plaintiff's depression "is well controlled on medications" and Plaintiff can tend to "her household and her children" when she takes these medications and abstains from alcohol and drugs:

- "When she abstains form drinking and is compliant with her psychotropic medications, she is stable and is able to take care of her household and help with her children."

- "The claimant has affective mood disorders, and some depression, which is well controlled on medications."

- "Although the claimant has had low global assessment of functions at time [sic] including on a consultative psychological evaluation, she has had mental health improvement and maintained a household when she is compliant with psychotropic medications and treatment and when she abstains from alcohol use."

- "When she is complaint with mental health treatment and medications and is abstinent from alcohol and marijuana. She had mental health improvement. She is able to cope with taking care of her household and her children."

R. 20-22. The ALJ also found that Plaintiff "has not had any substantiated permanent limitations or restrictions placed on her ability to perform basic work activities by any treating or examining physicians." R. 22.

*Analysis*

When, as here, an ALJ determines that a claimant has "a severe [mental] impairment(s) that neither meets nor is equivalent in severity to any listing, [the ALJ] will then assess [the claimant's] residual functional capacity." 20 C.F.R. § 416.920a(d)(3). A claimant's RFC represents his or her "maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis," SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted), despite the "total limiting effects" of his or her medically determinable impairments, 20 C.F.R.

§ 416.945(e).  Thus, "the RFC assessment *must* include a discussion of the individual's abilities" to function at that level "8 hours a day, for 5 days a week, or on an equivalent work schedule."  SSR 96-8p, 1996 WL 374184, at *1-2 (emphasis added).  It is not enough for the ALJ to conclude that the claimant "can work" despite his or her impairments—the ALJ must decide whether the claimant "could hold a job for a significant period of time."  *Weigel v. Astrue*, 425 F. App'x 706, 708-09 (10th Cir. 2011) (citing *Washington v. Shalala*, 37 F.3d 1437, 1442-43 (10th Cir. 1994)).  The RFC assessment also "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence" as well as an explanation of "how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved."  SSR 96-8p, 1996 WL 374184, at *7.

Further, the ALJ's decision as a whole must be sufficiently clear and specific for the court to determine whether the ALJ applied the correct legal standards and whether his or her factual findings are supported by substantial evidence.  *See Fleetwood v. Barnhart*, 211 F. App'x 736, 739 (10th Cir. 2007) (citing *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996)).  While the ALJ "is not required to discuss every piece of evidence" in the record, he or she must "discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects."  *Clifton*, 79 F.3d at 1009-10.  The court cannot meaningfully review an ALJ's decision if it must "draw factual conclusions on [the ALJ's] behalf," *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995), or if it is "'left to speculate what evidence led the ALJ'" to a particular finding or

conclusion, *Drapeau v. Massanari*, 255 F.3d 1211, 1214 (10th Cir. 2001) (quoting *Prince v. Sullivan*, 933 F.2d 598, 603 (7th Cir. 1991)).

The ALJ's determination of Plaintiff's RFC does not meet these standards. As noted, the ALJ's assessment of Plaintiff's mental health limitations is premised on his findings of (i) improvement as a result of medication, and (ii) improvement when Plaintiff abstains from drugs and alcohol. First, in finding such improvement, the ALJ failed to adequately consider relevant medical records reflecting findings and conclusions inconsistent with the ALJ's determination. Second, the improvement cited by the ALJ appears to have occurred at the earliest in April 2013 and, thus, even if properly found is not an adequate basis to determine that Plaintiff was not disabled for any twelve continuous months during the relevant time period of November 15, 2011, to November 27, 2013. Finally, the ALJ's assessment of Plaintiff's mental health limitations under the assumption that she abstains from drugs and alcohol is not an adequate basis to find that Plaintiff "is not disabled, even considering drug and alcohol use." R. 21.

### 1. Failure to Consider Significant Contradictory Evidence

The ALJ states that he gave "great weight to [Plaintiff's] attending and examining clinicians and psychologist/physicians, due to their treatment history and degree of contact with" Plaintiff. R. 21. Though the ALJ does not connect this determination to any specific finding or opinion—instead, the ALJ simply references *all* of Plaintiff's available medical records, *see* R. 21 (citing R. 250-344, 347-68, 414-537)—the undersigned presumes that he is referring to the findings and opinions reflected in his prior summary of the medical evidence, including as relevant to Plaintiff's mental health

8

the ALJ's summary of treatment records from Red Rock Behavioral Health Services ("Red Rock"). *Cf. Endriss v. Astrue*, 506 F. App'x 772, 777 (10th Cir. 2012) ("The ALJ set forth a summary of the relevant objective medical evidence earlier in his decision and he is not required to continue to recite the same evidence again in rejecting Dr. Wright's opinion."). *See generally* R. 347-51, 441-82. The ALJ's summary of those records is as follows:

> [Plaintiff] presented to Red Rock Behavioral Health Services for evaluation on January 6, 2012. She reported being on her fourth day of detox and reported that it takes everything she has to function. She lives with her ex-husband and kids. He supports her financially. She has no friends or social support. She reported that she could not stand to be around people and it makes her nervous to go out in public. She reported she smokes daily despite her health concerns. She was assessed with rule out PTSD, personality disorders/mental retardation, emphysema, and COPD.

> She had her Initial Psychiatric Evaluation on January 12, 2012. She reported she was divorced[,] with major depressive disorder since age 12. She reported having a very rough childhood. She lost her first husband who died in a motorcycle accident. She had extreme stress in her life and had a very rough divorce. She was seen by Dr. Ardis and Dr. Sebastian, but was off her medications. She had mood swings, pressured speech, decrease[d] sleep, anxiousness, and generalized anxiety disorder. She reported using alcohol one to three times a month. Dr. Jahangir Ghaznavi, M.D., diagnosed her with bipolar disorder, mixed with psychosis, generalized anxiety disorder, hypertension, and COPD. She was prescribed Paxil and Thorazine.

> On January 20, 2012, [Plaintiff] was diagnosed with major depressive disorder, recurrent severe without psychosis, alcohol dependence, nicotine dependence, emphysema, COPD, and was given a global assessment of functioning of 41. She reported depressive symptoms of excessive sleep, "crying all the time," and low self-esteem. . . . . [Plaintiff] was seen every couple of months in 2012 and was lastly seen on October 11, 2012.

> She was not seen again until February 28, 2013, when she had complaints of lots of issues and was unable to come so she had been off all medications. She was again stressed, irritable, and was not sleeping.

Upon treatment plan review on April [5], 2013, she had been "level," but still struggles with depression and stated she had no desire to leave her house. She recently quit smoking with assistance of vapor cigarettes. She drinks a few alcoholic beverages on the weekends. She reported she recently had medication changes and she was now able to sleep throughout the night without drinking for the first time since she could remember. She reported that she had good relationships with friends, but does not feel motivated to get out. She reported she usually gets along well with her ex, but due to a recent fight, she was temporarily moving out. Until moving out a few days prior, she was keeping up the house and cooking for the family. She was still paying fines for domestic violence cha[r]ge against her son six months prior. Her ex-husband's mother currently provides financial support. Her mental health symptoms were controlled by medications and she continued to deny any suicidal or homicidal ideations.

On her last Physician's progress note of June 25, 2013, she continued to have the same diagnoses as above. She had neat and clean appearance, speech was normal, thought processes were logical, her mood/affect was normal and her sleep was normal.

R. 19 (paragraph breaks added) (citation omitted).

Based largely on this evidence, the ALJ ultimately found that Plaintiff "has had mental health improvement and maintained a household when she is compliant with psychotropic medications and treatment and when she abstains from alcohol use." R. 22. Viewed in isolation, the cited Red Rock records do tend to support the ALJ's finding of mental health improvement in April and June of 2013. But both within and outside of those records are contradictory findings and conclusions by Plaintiff's mental health providers regarding Plaintiff's level of functioning—which the ALJ was required to consider but did not. In particular, the ALJ omits from his discussion the treatment notes prepared by treating psychiatrist Dr. Ghaznavi and Plaintiff's other providers at Red Rock for the period from February 2012 to January 2013, other than to state that Plaintiff "was seen every couple of months in 2012." *See* R. 19.

As noted in the ALJ's summary, Plaintiff was first seen at Red Rock on January 6, 2012. *See* R. 19, 199, 350-51. She told the case manager, Haley Hope, MS, that she felt hopeless and that it "takes everything I've got to function." R. 350. Ms. Hope observed that Plaintiff "ramble[d] and struggle[d] to stay on task/answer questions" during their conversation. *Id.* Ms. Hope assigned a global assessment of functioning ("GAF") score of 30, and scheduled Plaintiff for an appointment with the medication clinic. *Id.*[3] The ALJ referred to this evaluation but did not discuss Ms. Hope's observations or GAF assessment in his summary of the medical-source evidence.

Plaintiff established care with Dr. Ghaznavi on January 12, 2012. *See* R. 347-49. Dr. Ghaznavi observed that Plaintiff appeared "unkempt and disheveled"; exhibited an "elevated, irritable, and anxious" mood and "labile and angry" affect; and expressed both

---

[3] A GAF score "represents a clinician's judgment of the individual's overall level of functioning" at a given time. Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed. 2000) (*DSM-IV*). Here, Plaintiff was initially assessed by Red Rock and other examining clinicians as having a GAF score of 30, and then beginning in February 2012 was consistently assessed as having a GAF score of 41. *See* R. 350 (January 6, 2012, GAF score of 30); R. 441 (January 20, 2012, GAF score of 30); R. 366 (February 1, 2012, GAF score of 41); R. 451 (October 11, 2012, GAF score of 41); R. 471 (April 5, 2013, GAF score of 41); R. 477 (May 2, 2013, GAF score of 41); R. 480 (June 25, 2013, GAF score of 41). A GAF score between 21 and 30 indicates: (1) that the patient's "behavior is considerably influenced by delusions or hallucinations"; or (2) "serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccuption)"; or (3) an "inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)." *DSM-IV* 34. A GAF score between 41 and 50 indicates that "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)." *Id.* The ALJ mentioned some of these GAF scores in his decision, *see* R. 17-20, 21, but he did not explain the inconsistency between his finding of improvement in spring 2013 and the clinicians' GAF assessments indicating an absence of improvement in overall functioning during the same period.

"impaired" judgment and "loose, tangential, and circumstantial" thought processes. R. 348. He also observed that Plaintiff appeared to be suffering from delusions and auditory hallucinations. *Id.* Based on this exam, Dr. Ghaznavi diagnosed Plaintiff with bipolar disorder, mixed with psychosis and generalized anxiety disorder. He prescribed Paxil and Thorazine and instructed Plaintiff to return in four weeks.[4] R. 349. The ALJ referred to this evaluation and Dr. Ghaznavi's diagnoses.

Plaintiff returned to Red Rock on January 20, 2012, for her first treatment planning meeting. *See* R. 441-45. Plaintiff's treatment team agreed that she could be discharged from Red Rock's care once she was "stable on [her] meds," could "manage behaviors and social interactions" without assistance, "meet [her] basic needs," "utilize[] healthy coping skills," and abst[ain] from drugs/alcohol." R. 443. The ALJ referred to this evaluation, but with some inaccuracies. Case manager Thomas Devine noted that Plaintiff had been diagnosed with alcohol dependence, nicotine dependence, and recurrent severe major depressive disorder *with* psychosis—not without psychosis, as the ALJ stated in his summary of this treatment record. *Compare* R. 441, *with* R. 19. Mr. Devine also noted that Plaintiff's GAF score was still 30—not 41, as the ALJ stated. *Compare* R. 441, *with* R. 19.

---

[4]  Paxil (paroxetine) is an antidepressant that is approved to treat major depressive disorder, generalized anxiety disorder, panic disorders, and post-traumatic stress disorder. *See* Nat'l Insts. of Health, *Paroxetine*, Medline Plus (Nov. 15, 2014), https://www.nlm.nih.gov/medlineplus/druginfo/meds/a698032.html. Thorazine (chlorpromazine) is a "conventional antipsychotic[]" that is approved to treat symptoms associated with schizophrenia and bipolar disorder. Nat'l Insts. of Health, *Chlorpromazine*, Medline Plus (May 16, 2011), https://www.nlm.nih.gov/medlineplus/druginfo/meds/a682040.html.

Plaintiff saw Dr. Ghaznavi as scheduled on February 9, 2012. R. 446. She reported that she took her medications as prescribed but that she was experiencing "severe nightmares," insomnia, and "manic symptoms" on Thorazine. *Id.* On exam, Dr. Ghaznavi observed that Plaintiff exhibited pressured speech, an "anxious [and] irritable mood," a "labile" affect, and still appeared to be suffering from delusions and hallucinations. *Id.* Dr. Ghaznavi confirmed Plaintiff's original diagnosis of recurrent, severe major depressive disorder with psychotic features, and changed Plaintiff's prescription medications.[5] *See* R. 459. These observations were not discussed by the ALJ, other than his note that Plaintiff was "seen every couple of months in 2012." R. 19.

Plaintiff saw Dr. Ghaznavi again on April 5, 2012. *See* R. 456. Dr. Ghaznavi noted that Plaintiff did "not appear medication compliant," was under "extreme stress," and "need[ed] immediate help w[ith] psychosocial and financial issues." *Id.* On exam, Dr. Ghaznavi observed that Plaintiff's mood was "depressed, anxious, and irritable," her speech was pressured, and she was suffering from delusions. *Id.* Dr. Ghaznavi confirmed Plaintiff's original diagnosis; refilled Plaintiff's Paxil, Saphril, and Vistrail; and instructed Plaintiff to start taking 200 mg Thorazine every day rather than on an "as

---

[5] Specifically, Dr. Ghaznavi increased Plaintiff's daily dose of Paxil, changed her Thorazine to an "as needed" dosage, and added two new medications: 10 mg Saphris once daily, and 50 mg Vistaril as needed. R. 459. Saphris (asenapine) is an "atypical antipsychotic[]" medication that is approved to treat symptoms associated with schizophrenia and bipolar disorder. Nat'l Insts. of Health, *Asenapine*, Medline Plus (Jan. 15, 2016), https://www.nlm.nih.gov/medlineplus/druginfo/meds/a610015.html. Vistaril (hydroxyzine) is approved to treat anxiety and symptoms associated with alcohol withdrawal. Nat'l Insts. of Health, *Hydroxyzine*, Medline Plus (Sept. 1, 2010), https://www.nlm.nih.gov/medlineplus/druginfo/meds/a682866.html.

needed" basis. R. 456, 458. These observations were not mentioned separately from the ALJ's statement that Plaintiff was "seen every couple of months in 2012." R. 19.

Plaintiff saw Dr. Ghaznavi again on May 31, 2012. R. 461. She reported that she took her medications as prescribed but had experienced a "severe reaction" to some or all of those medications. *Id.* Dr. Ghaznavi refilled Plaintiff's Paxil and Vistaril, discontinued Plaintiff's Thorazine and Saphris, and added 6 mg Fanapt once per day.[6] R. 463. On July 26, 2012, Plaintiff told Dr. Ghaznavi that she "did not like Fanapt since she has not been sleeping" and wanted to restart Saprhis and Thorazine. R. 464. Although Plaintiff reported doing "OK otherwise," Dr. Ghaznavi observed on exam that Plaintiff still exhibited a "depressed [and] anxious" mood and appeared to be suffering from delusions. *Id.* Dr. Ghaznavi confirmed Plaintiff's original diagnosis, refilled her 40 mg Paxil, and restarted Plaintiff on 10 mg Saphris and 100 mg Thorazine once daily. R. 465. Again, these observations and findings were omitted from the written decision. R. 19.

On October 11, 2012, Plaintiff told Dr. Ghaznavi that she took her medication as prescribed without adverse side effects, except that she was "still not sleeping well." R. 466. On exam, Dr. Ghaznavi observed that Plaintiff's mental status was generally within normal limits. *See id.* He refilled Plaintiff's 40 mg Paxil and 10 mg Saphris, discontinued her Thorazine, and added 200 mg Seroquel once daily.[7] R. 468. The next

---

[6] Fanapt (iloperidone) is an "atypical antipsychotic[]" medication that is approved to treat symptoms associated with schizophrenia. Nat'l Insts. of Health, *Iloperidone*, Medline Plus (Mar. 15, 2016), https://www.nlm.nih.gov/medlineplus/druginfo/meds/a609026.html.

[7] Seroquel (quetiapine) is an "atypical antipsychotic[]" medication that is approved to

day, Plaintiff attended a treatment planning meeting with Savannah Burghardt, MS, a Red Rock case manager. *See* R. 451-55. Plaintiff told Ms. Burghardt that her current medications "controlled" her hallucinations and "reduced" her depression symptoms, but that she still experienced "frustration that makes her not want to get up." R. 454. Ms. Burghardt noted that Plaintiff's current GAF score had improved to 41, *see* R. 451, which indicates that Plaintiff had "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)," *DSM-IV* 34. These observations were not discussed by the ALJ. R. 19.

The ALJ correctly noted that Plaintiff did not see Dr. Ghaznavi again until February 28, 2013, when she told the psychiatrist that she "had lots of issues and [was] unable to come so [she had] been off all medication." *See* R. 19, 448. On exam, Dr. Ghaznavi observed that Plaintiff appeared "unkempt"; exhibited an angry, anxious, and labile mood/affect, as well as an "illogical" thought process marked by "magical thinking"; and appeared to be suffering from "impaired" short-term memory and delusions. R. 448. Dr. Ghaznavi also opined that Plaintiff's "current problems/symptoms appear [to be] worsening" and now included paranoia. R. 449. He discontinued Plaintiff's Seroquel and Thorazine, refilled her 40 mg Paxil, and added 120

---

treat symptoms associated with schizophrenia, bipolar disorder, and depression. Nat'l Insts. of Health, *Quetiapine*, Medline Plus (Apr. 15, 2014), https://www.nlm.nih.gov/medlineplus/druginfo/meds/a698019.html.

mg Latuda once daily and 150 mg Trazodone as needed.[8]  R. 450.  While the ALJ

referred to this evaluation, he did not mention Dr. Ghaznavi's objective findings—or

specifically his opinion that Plaintiff's symptoms were worsening—in his decision. *See*

R. 19.

Plaintiff attended another treatment planning meeting at Red Rock on April 5,

2013.  *See* R. 471.  As the ALJ noted, Plaintiff told her case manager that she "has been

'level,' but still struggles w[ith] depression" and "has no desire to leave her house."  R.

475.  The case manager also noted Plaintiff's comment that she "was keeping up house

and cooking for family" until moving out of her ex-husband's home "a few days ago."

*Id.*  In contrast to the ALJ's conclusion that Plaintiff's "mental health symptoms were

controlled by medications" as of April 2013, R. 19, these records indicate that Plaintiff

reported that her new medications controlled her *hallucinations* and allowed her to sleep

through the night without drinking.  R. 475.  The ALJ also did not discuss the clinicians'

assessments that: (i) Plaintiff should receive individual "psychosocial rehab" services

four times a month in order to "learn 3 symptoms of [her] illness and practice healthy

coping skills" (R. 473); (ii) Plaintiff could be discharged from these services once she

"ha[d] appropriate social skills," could "meet [her] basic needs," and had the "resources

---

[8] Latuda (lurasidone) is an "atypical antipsychotic[]" medication that is approved to treat
symptoms associated with schizophrenia, depression, and bipolar disorder.  Nat'l Insts. of
Health, *Lurasidone*, Medline Plus (Jan. 15, 2016), https://www.nlm.nih.gov/medlineplus/
druginfo/meds/a611016.html.  Trazodone is a serotonin modulator that is approved to
treat depression, insomnia, and schizophrenia, and anxiety.  *See* Nat'l Insts. of Health,
*Trazodone*, Medline Plus (Nov. 15, 2014), https://www.nlm.nih.gov/medlineplus/
druginfo/meds/a681038.html.

to meet [her] treatment needs without [Red Rock's] assistance" (R. 475); and (iii) the anticipated discharge date was April 12, 2014 (*id.*). In particular, the ALJ did not explain the inconsistency between the clinicians' implicit opinion that Plaintiff could not "meet [her] basic needs," and was not expected be able to do so until April 2014, with the ALJ's finding that Plaintiff can "take care of her household and help with her children" as long as she takes her medications. R. 20.

Plaintiff saw Dr. Ghaznavi again on May 2, 2013. R. 477. She told Dr. Ghaznavi that she was "doing well" on her current medications. *Id.* Dr. Ghaznavi opined that Plaintiff was "stable" on those medications and that her mental status was generally within normal limits. *Id.* He also noted that Plaintiff's current GAF score was still 41, and that she had not experienced any "noteworthy" psychiatric "changes since [her] last visit" in February 2013. *See id.* Dr. Ghaznavi's June 25, 2013 progress note reflects similar findings. *See* R. 480. On this visit, Dr. Ghaznavi confirmed his original diagnosis of severe, recurrent major depressive disorder *with* psychotic features—not "without psychosis" as the ALJ stated in his summary. *Compare id.*, *with* R. 19. Again, while the ALJ discussed this evaluation, he did not mention Dr. Ghaznavi's diagnoses or Dr. Ghaznavi's assessment that Plaintiff's GAF was at a level indicating that Plaintiff had serious symptoms or serious impairment in social or occupational functioning. R. 19; *see DSM-IV* 34.

The ALJ's failure to meaningfully address evidence of Plaintiff's mental illness— particularly findings and opinions included in the medical records on which the ALJ apparently relied—leaves the Court unable to ascertain whether the ALJ properly

evaluated Plaintiff's RFC with respect to her mental abilities throughout the relevant time period. *See Fleetwood*, 211 F. App'x at 739-41; *Weigel*, 425 F. App'x at 710. Specifically, the ALJ's decision does not make clear how he determined that Plaintiff's medications "controlled" her mental illness or that Plaintiff's ability to "cope with maintaining a household," R. 22, compelled the conclusion that Plaintiff could work on a regular and continuing basis during the relevant period. *Cf. Henderson v. Colvin*, 82 F. Supp. 3d 1218, 1223 (D. Colo. 2015) ("The ability to engage in limited household and other activities of daily living does not equate to the ability to perform substantial gainful activity on a regular work schedule." (citing 20 C.F.R. § 404.1572(c); *Thompson v. Sullivan*, 987 F.2d 1482, 1490 (10th Cir. 1993)). This Court cannot weigh that evidence in the first instance. *Weigel*, 425 F. App'x at 708-09.

Even if it were assumed that the ALJ considered but rejected the findings and opinions cited above, it would follow that the ALJ impermissibly relied upon "portions of evidence favorable to his position while ignoring" or mischaracterizing other evidence in the same medical records that undermines his conclusion that Plaintiff could work on a regular and continuing basis. *See Hardman v. Barnhart*, 362 F.3d 676, 681 (10th Cir. 2004) ("It is improper for the ALJ to pick and choose among medical reports, using portions of evidence favorable to his position while ignoring other evidence."); *cf. Sitsler v. Astrue*, 410 F. App'x 112, 117-18 (10th Cir. 2011) ("We have criticized this form of selective and misleading evidentiary review, holding that an ALJ cannot use mischaracterizations of a claimant's activities to discredit his claims of disabling limitations." (citing *Sisco v. U.S. Dep't of Health & Human Servs.*, 10 F.3d 739, 742-43

(10th Cir. 1993)). Remand is therefore required for the ALJ "to consider and discuss the relevant evidence, to provide reasons for accepting or rejecting the evidence, and to apply the correct legal standards." *Weigel*, 425 F. App'x at 708-09 (citing *Clifton*, 79 F.3d at 1009-10).

### 2. Effect of Finding of Improvement with Medication

As noted, the ALJ premised his determination of Plaintiff's mental health limitations on a finding that Plaintiff "has had mental health improvement and maintained a household when she is compliant with psychotropic medications and treatment and when she abstains from alcohol use." R. 22. The records referenced by the ALJ as indicating improvement reflect evaluation and treatment in April and June 2013. R. 19, 21. Even if a finding of improvement in mid-2013 were properly made, however, that would not by itself reasonably allow the ALJ to determine that Plaintiff was not disabled for *any* 12 continuous months during the relevant time period of November 15, 2011, to November 27, 2013.

The ALJ's decision does not reflect that he considered whether Plaintiff's mental health impairment resulted in limitations that prevented her from working on a regular and continuing basis for any qualifying 12-month period—as opposed to merely after the cited improvement. 20 C.F.R. § 416.905 (defining disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months"). The treatment records from spring 2013 referenced by the ALJ as showing improvement indicate that some of Plaintiff's mental-health symptoms were

responding to a *new* combination of antipsychotic and antidepressant medications. *See* R. 19, 21, 475, 477. Although those records speak to Plaintiff's condition between April and November 2013, they are not evidence of Plaintiff's ability to function in an ordinary work setting on a regular and continuing basis for any 12 continuous months prior to that period. This is a failure to follow applicable legal standards, requiring that the matter be remanded for evaluation of Plaintiff's RFC prior to April 2013.

3. Effect of Finding of Improvement upon Abstention from Drugs and Alcohol

The Commissioner has adopted a special procedure for evaluation of whether a claimant who has limitations caused by drug or alcohol abuse ("DAA") is disabled *only* because of that drug or alcohol abuse. 20 C.F.R. § 416.935(b); *see also* 42 U.S.C. § 423(d)(2)(C) ("An individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled."). The ALJ must follow this procedure if he finds that the claimant is disabled and the claimant's record contains "medical evidence of [his or her] drug addiction or alcoholism." 20 C.F.R. § 416.935(a); *see also Drapeau*, 255 F.3d at 1214; *Evaluating Cases Involving Drug Addiction and Alcoholism (DAA)*, 78 Fed. Reg. 11939, 11941-42 (Feb. 20, 2013). In making this determination, the "key factor . . . is whether [the ALJ] would still find [claimant] disabled if [claimant] stopped using drugs or alcohol." 20 C.F.R. § 416.935(b)(1). The ALJ must evaluate which of the claimant's physical and/or mental limitations, upon which the threshold disability determination was based, would remain if the claimant stopped using drugs or alcohol, and then determine whether any or

all of the remaining limitations would be disabling. *Id.* § 416.935(b)(2). If the ALJ finds that a claimant's remaining limitations would not be disabling, then the DAA is a material contributing factor to the claimant's disability and the ALJ must determine the claimant is not disabled. *Id.* § 416.935(b)(2)(i). If the ALJ finds that the remaining limitations would in and of themselves be disabling, then the ALJ must determine that the claimant is disabled. *Id.* § 416.935(b)(2)(ii).

Here, although the ALJ found a severe medically determinable impairment of "past alcohol abuse," *see* R. 13-14, the ALJ did not follow the DAA evaluation procedure because he determined that Plaintiff "is not disabled, even considering drug and alcohol use." R. 21. Notwithstanding this statement, the ALJ proceeded to expressly and repeatedly premise his RFC assessment on a finding that Plaintiff's mental health symptoms improve when she abstains from alcohol use. R. 20-22.[9] Again, the ALJ referred to recent improvement without addressing Plaintiff's limitations prior to that improvement. As written, the ALJ's RFC determination addresses Plaintiff's functioning

---

[9] The ALJ's written decision is all the more confounding given his repeated statements during the August 2013 administrative hearing that it would be "difficult for [him] to avoid saying that alcohol is a material issue to [Plaintiff's] mental health when the most recent mental evaluation evidence . . . still has [her] diagnosed as alcohol dependent" in June 2013. R. 45; *see also id.* at 44, 45, 46, 47. Plaintiff's counsel then asked for the ALJ's help obtaining additional medical evidence from Red Rock that could demonstrate Plaintiff was "disabled" during the relevant time even though she had stopped abusing alcohol. *See id.* at 48-50, 52. The ALJ noted his reluctance to "g[et] involved in trying to do that" because his past interactions with claimants' doctors "have ended up being protracted, disputatious messes" and were "irritating to the staff lawyers" who work with him. *Id.* at 50. The Court reminds the Commissioner of the obligation to "make every reasonable effort to help [claimants] get medical reports from [their] own medical sources" before determining that the claimant is not disabled. 20 C.F.R. § 416.912(d).

only when she abstains from alcohol and implies that Plaintiff *is or may be* disabled when she abuses alcohol.  If abstinence from drugs or alcohol is a necessary premise of the RFC determination, the ALJ was required to follow the DAA evaluation procedure.  This too is a failure to follow applicable legal standards, requiring that the matter be remanded for further consideration.

## CONCLUSION

The decision of the Commissioner is reversed and the case remanded for further consideration pursuant to the fourth sentence of 42 U.S.C. § 405(g).  A separate Judgment will enter.

ENTERED this 31st day of March, 2016.

_____
CHARLES B. GOODWIN
UNITED STATES MAGISTRATE JUDGE